REID, Judge.
Plaintiff Marvin L. Richardson filed this suit for workman’s compensation benefits against his former employer The Weitz Company and its compensation insurer Employers Mutual Casualty Company as a result of an accident which occurred on November 23, 1962.
Plaintiff was working as a structural carpenter for Weitz Company and slipped while working on a scaffold and fell to the concrete floor below sustaining injuries to his seventh thoracic vertebra and other bruises and contusions including a laceration of his scalp.
Both defendants answered and admit amicable demand but deny the main allegations of plaintiff’s petition. They further allege that plaintiff was requested by them to appear for examination by a competent physician of their choice on February 1, 1963. Plaintiff without notice or reason or justification failed to appear for the medical examination and they were entitled to and did suspend any payments thereafter. They further admit that the incident allegedly occurred during the course of his employment.
The case was tried on February 1, 1965 and held open for the taking of the testimony of Dr. Irving Redler and Dr. George Battalora. The testimony of Dr. Redler was taken and filed in the record, but the testimony of Dr. Battalora, a witness for the plaintiff, was not taken and therefore is not in the record. The parties were given a certain time after the completion of the record to file briefs but did not do so. Finally, on March 28, 1966, the Trial Judge rendered judgment dismissing plaintiff’s suit at his costs, which judgment was signed on June 30, 1966.
From this judgment plaintiff has brought this appeal.
On the morning this case was to be argued before this Court the plaintiff filed a motion to remand the case to the Lower Court because the record was incomplete on account of the testimony of Dr. George Battalora not being in the record; to introduce into evidence certain bills of Dr. Batta-lora which support their contention as to dates and nature of treatments which likewise were not in the record, and argued that this testimony and these bills were essential to determination of the understand-, ing of this case.
*363 The motion to remand is based on the fact that the testimony of Dr. George Bat-talora was never taken or placed in the record. Counsel argues that the defendant should have had the testimony of Dr. Bat-talora taken in order to complete the record and the Trial Judge should not have decided the case until after the record was complete and the briefs filed, in accordance with his last ruling.
We know of no rule of law which compels the defendant to offer the testimony of the plaintiff’s witnesses unless they desire to use it for their own benefit. It was the duty of the plaintiff to get his witnesses’ testimony in the record within a reasonable time after the Court closed the case granting permission to plaintiff to put Dr. Batta-lora’s testimony in the record. The case was held open for over a year in order to permit this to be done before the Judge finally decided the case. It may be true that the attorney handling the matter for the plaintiff had severed his connection with the firm who filed the suit, but there were sufficient members remaining in the firm to have had this testimony taken and, put in the record, within the long period of time between the trial of the case and the final rendition of judgment by the Trial Judge.
Be that as it may, the record shows that the plaintiff was not too anxius to have Dr. Battalora’s testimony in the record. Plaintiff’s attorney stated in open Court that he might wish to take the deposition of Dr. Battalora to prove up just his bill which he gave them. After a little discussion the Court suggested that plaintiff close in chief but in the event he desired to rebut any testimony the defense might offer, he would have that right and he might possibly want to take the testimony of Dr. Battalora to which plaintiff’s attorney agreed. The final order of the Court was that the plaintiff would reserve their rights to procure the deposition of Dr. Battalora and defendant to obtain the deposition of Dr. Redler and to submit memorandum of authorities, plaintiff given fifteen days in which to submit his memorandum and defendant an additional period of fifteen days in which to submit its memorandum. We might point out that plaintiff testified that Dr. Batta-lora discharged him in October, 1963.
Under these circumstances we do not feel that plaintiff is entitled to have this case remanded to take the testimony of Dr. Battalora-and the motion is accordingly overruled.
This brings us to the merits of the case. There is no question but what plaintiff was severely injured on a construction job in Destrehan on the morning of November 23, 1962. He fell from a scaffold some twelve to seventeen feet, landing upon his back upon a concrete surface and sustained a compressed fracture of the seventh thoracic - vertebra.
Plaintiff was first taken to Dr. Weil-baecher who gave him emergency treatment and sent him to a hospital. He stayed there a day or two and asked to be transferred to the Seventh Ward General Hospital in Tangipahoa Parish, nearer his home, which was done. The doctor the^e was Dr. Edmond J. Daley who treated him. Dr. Daley testified that he first saw the plaintiff on November 24, and he had been sent to the Seventh Ward Hospital by Dr. Gaupp of New Orleans with a note saying that he had . slipped off a scaffold and had a laceration of the scalp and mild concussion and in his note he said that there was a compression fracture of the thoracic four-five-six. Dr. Gaupp said though that the radiologist did not agree with him. Dr. Daley further testified that he had an x-ray taken on November 26th by a competent radiologist and that they found a slight wedging noted involving the mid portion of the body of the body of the thoracic vertebra number seven. There was no anterior or posterior misplacement. Dr. Daley had the outside films that were taken in New Orleans which were reviewed by the radiologist and said there was a minimal wedged body of the seventh vertebra demonstrated by the out *364 side films. There was no essential change in the films taken in New Orleans and the ones taken by Dr. Daley’s radiologist. The plaintiff was put to bed in the hospital and administered muscle relaxants, something for pain, and he stayed in the hospital about two weeks when he was sent home on boards. He was discharged from the hospital on December 8th. Dr. Daley saw him on that day and on December 22nd, 1962, the Sth of January and 12th of January, 1963. At that time Dr. Daley found a normal range of motion in the thoracic spine and no muscle spasms. Plaintiff could reach down and touch the floor with both hands, but was still complaining of pain. Dr. Daley sent him back to the hospital and got repeat x-rays by a different radiologist which were taken on January 3rd, 1963. There was essentially no difference in the films from the ones previously taken. The slight wedging of the body in the thoracic vertebra number seven was evident but it had not progressed, and there was no alteration in the contour of plaintiff’s body since the previous examination and there was no evidence of any increased osteos depositions by his margins.
Dr. Daley discharged the plaintiff on January 12th, 1963 as being able to go back to work, but did recommend in view of the fact plaintiff was still suffering pain that he consult a competent orthopedist. It was at this time that plaintiff went to see Dr. George Battalora, whom he saw on thirty-three different times.
Plaintiff, about four or six weeks after his discharge by Dr. Battalora, went back to Dr. M. O. Weilbaecher in Destrehan. Dr. Weilbaecher testified that he first saw the plaintiff the day of the accident at which time he gave him emergency treatment. He testified that plaintiff had fallen on his shoulder and the back of his head and his scalp had been cut. Plaintiff was in severe pain at the time, claimed a shortness of breath and difficulty breathing and was bleeding somewhat from the laceration on the back of his head. He had x-rays made which revealed a compression type fracture of the seventh dorsal vertebra. When asked how much compression did he show at the time he stated that recent x-rays in January showed 20% loss of the height of the vertebra. Dr. Weilbaecher after the plaintiff was transferred to Seventh Ward Hospital did not see plaintiff for about a year, or until November 8, 1963. At that time plaintiff gave him a history of being hospitalized in Hammond, or by bed rest at home for a while, and then he was under the care of an orthopedist in New Orleans and continued to have symptoms of trouble and came back to see Dr. Weilbaecher. At that time Dr. Weilbaecher made an examination and stated that plaintiff had considerable muscle spasms, along the spine and the injured area and upper and mid back. He testified that he used a Medco Sonalator, a machine that detects muscle injury or irritation. He considered the finding of this machine to be objective because when an area is tested out you pick up the trigger point and the patient may complain of sensory or pain in that area and you move to other areas and come back reaching the same area and he keeps complaining of pain. He considered this an objective finding that the patient would have pain in that area. He further testified that he gave the plaintiff nineteen treatments. He further testified that the plaintiff had osteoporosis, a softening of the bone, which is brought about by atrophy or by disuse. He also testified that he did not think it would be wise for plaintiff to do heavy laborious work because plaintiff’s symptoms would become symptomatic even more than they would from other types of work, and he would likely have recurrence of pain, discomfort and disability of the back.
On cross examination Dr. Weilbaecher testified that he had seen the osteoporosis in the adjacent vertebra and that Richardson had last seen him in January of ’64 and that he had improved while being treated by him. He further testified that he had seen a copy of Dr. Redler’s report and that he *365 would have to agree with his report, namely, his objective findings. He also testified that trigger points that he found could not be determined to have resulted from the initial injury.
The defense offered the testimony of Dr. Irving Redler taken by deposition. Dr. Redler testified that he first saw this patient on December 12, 1963. At that time plaintiff gave him the history of his injury sustained in the fall from a scaffold. He told him that he had fractured the seventh thoracic vertebra. He further testified that plaintiff was about five feet eight inches in height and weighed about one hundred seventy-five pounds, and appeared to walk normally after he was undressed. His examination did not show any deformity of the trunk. He was able to stand erect. The cervical lordosis was found to be normal as were the dorsal kyphosis and the lumbar lordosis. The trunk was not bent either to the right or the left side. The pelvis was level and the lower extremities were equal in length.
Dr. Redler’s examination of the neck revealed that the plaintiff had a complete range of motion, he did not find any spasms of the muscles of the neck or the shoulder, movement of the upper extremities could be carried out to complete range. Dr. Redler had x-rays taken and the neck and low back were normal. His physical examination revealed that and it was verified by x-rays. The x-rays of the thoracic spine revealed an apparent healed compression fracture of the seventh thoracic vertebra. Dr. Redler’s conclusion was that plaintiff had a healed fracture of the thoracic vertebra number seven and that he had no functional impairment of his back and no disability. Dr. Redler had difficulty in evaluating the plaintiff’s pain because the fracture was completely healed, and in his opinion the plaintiff could resume his work as a carpenter.
Dr. Redler saw the plaintiff again on July 30th, 1964. At this time plaintiff told Dr. Redler he had gone back to construction work. This examination showed plaintiff’s condition as normal and the x-rays showed no change in those previously taken. In Dr. Redler’s opinion there was sufficient time between the two sets of x-rays for any change to take place if there was going to be any. He also testified that the complaints of plaintiff about neck pains were not consistent with the fracture of the thoracic vertebra number seven, nor would such a fracture cause low back pains, although this complaint was made by plaintiff at this subsequent examination. Dr. Redler also testified that he knew of the “Medco Sonalator” used by Dr. Weilbaecher but that he never used it. He stated that it would stimulate any muscle by an electrical impulse and put it into spasm which would cause the muscle to hurt. In his opinion this would be the same as putting a cramp into a muscle. He reiterated that plaintiff was able to go back to work as a carpenter.
Plaintiff himself testified as to the accident, about seeing Dr. Weilbaecher the first time and his being in the hospital in St. James Parish, his transfer to Seventh Ward General Hospital in Tangipahoa Parish, and his treatments by Dr. Daley. He stated, however, that his back continued to hurt and cause him trouble. He said that he went to see Dr. Battalora after Dr. Daley suggested that he see- an orthopedist and Dr. Battalora gave him some thirty-three treatments. He further testified that Dr. Battalora discharged him but that his back was still hurting. He went to see Dr. Weilbaecher after his discharge by Dr. Battalora. Dr. Weilbaecher put an electric vibrator on his back and gave him a shock treatment and a prescription for some medicine, heat treatments and x-rayed him. He made seventeen trips to see Dr. Weil-baecher. He also testified that he went back to work in April of 1964 and had been working off and on at different jobs up until the time of the trial.
*366 Plaintiff appellant complains of the following errors by the Trial Judge:
“L That, as a matter of law, based upon the entire medical and lay testimony, there was no valid basis upon which the trial Court could deny all further compensation beyond the nine (9) weeks paid voluntarily;
2. Alternatively, even conceding the full face value of the precise meaning of the expert medical testimony of Dr. Redler offered by defendants, and disregarding all conflicting medical evidence offered by the plaintiff, the trial Court erred in denying any further compensation whatever;
3. That the trial Court erred in denying plaintiff recovery for compensation on the basis of total and permanent disability.”
We are satisfied from all the medical and lay testimony in the record that the plaintiff did suffer an injury but that the compression fracture of the seventh thoracic vertebra had healed. We are further satisfied that plaintiff, even by the testimony of Dr. Redler, would take about from six to nine months to recover from such a fracture. The defendant insurer paid compensation for nine weeks voluntarily and then discontinued it because Mr. Richardson failed to keep his appointment with Dr. Redler.
We feel that the Trial Judge did err in not awarding the plaintiff more compensation than the nine weeks which had been voluntarily paid. We feel that he was entitled to compensation up until April of 1964, when he began to work again.
Defendants urged that they were justified in stopping the compensation payments at the end of the nine weeks period because of the failure of plaintiff to keep his appointment with Dr. Redler. In this respect we believe they are wrong. The record shows that the appointment was made ex parte by the defendants and no order of Court was obtained for the plaintiff to appear for said examination, in fact, suit at that time had not been filed. Subsequent to the filing of the suit plaintiff appeared before Dr. Redler and submitted to the examination sought.
We find the case of Green v. Liberty Mutual Insurance Company, 184 So.2d 801 decided by the 3rd Cir.Ct. App. wherein the Court held as follows:
“' * * * an employer should not be entitled to require an employee to submit to a specific medical examination simply upon his own ex parte determination that such is reasonable, upon penalty to the employee of loss of his compensation if he resists the employer’s request as unreasonable. A judicial determination, pursuant to contradictory proceeding, should similarly be necessary to justify an employer’s suspension of compensation payments because of an employee’s allegedly unreasonable refusal to submit to medical examination.'
******
“(12) Nothing we say here, of course, is intended to militate against the employer’s termination of compensation payments to an employee whose disability the employer has reasonable cause to believe is no longer compensable. We hold only that an employer may not terminate the payment of compensation payments to a disabled employee solely because the employee fails to report for a medical examination arranged ex parte by the employer. For the drastic remedy of suspension of subsistence compensation to apply, we hold that a prior judicial determination must have been made that the employer-requested medical examination is reasonable as to time, place, and circumstances, following which the employee then defaulted in his judicially-determined obligation to report for this particular medical examination.”
For the foregoing reasons it is ordered that the judgment of the Lower Court be *367 reversed and that the plaintiff have and recover judgment in his favor and against the defendants, in solido, for compensation in the amount of $35.00 per week from November 23, 1962 until May 1, 1964 subject to credit for the nine weeks already paid, and the defendants to pay all costs of this suit.
Reversed and rendered.